934 So.2d 861 (2006)
Katherine A. MEYER, Wife of/and Keith Meyer
v.
Paul TUFARO, the Italian Pie Franchise, L.L.C., Italian Pie, L.L.C., Pizza, L.L.C., Musa Ulusan, Serdar Tilioglu, Tom Cangemi, Progressive Insurance Company, State Farm Insurance Company and XYZ Insurance Company.
No. 2005-CA-1110.
Court of Appeal of Louisiana, Fourth Circuit.
June 7, 2006.
*862 Andrew D. Weinstock, Joseph G. Glass, Duplass, Zwain, Bourgeois & Morton, Metairie, *863 LA, for Plaintiff/Appellant, Katherine A. Meyer.
Raymond P. Ladouceur, Ladouceur and Ladouceur, L.L.C., New Orleans, LA, for Defendants/Appellees, Mustafa Misirci, Serdar Tilioglu and Thomas Cangemi.
John E. Faherty, Jr., Morse, McGinty, Bordelon & Casler, Lynnette Hall-Lewis, Wallace, Casler & McGinty, Metairie, LA, for Appellants, Paul Tufaro and Progressive Security Insurance Company.
(Court composed of Chief Judge JOAN BERNARD ARMSTRONG, Judge DENNIS R. BAGNERIS SR. and Judge ROLAND L. BELSOME).
JOAN BERNARD ARMSTRONG, Chief Judge.
The plaintiff/appellant, Katherine A. Meyer, and her husband, Keith Meyer, filed suit on August 13, 2001 for damages allegedly sustained when the car in which Mrs. Meyer was traveling was struck from behind while stopped at an intersection by a vehicle driven by Paul Tufaro. Named original defendants were the driver and his insurer, Progressive Insurance Company, The Italian Pie Franchise, L.L.C., Italian Pie, L.L.C., Pizza, L.L.C., Musa Ulusan, Serdar Tilioglu, Tom Cangemi, and the then unidentified insurer of "The Italian Pie, individual and/or entity defendants." The plaintiffs also sued their own insurer, State Farm Insurance Company, alleging unfair and/or deceptive trade practices causing the plaintiffs to have elected lower limits of uninsured and underinsured motorist bodily injury coverage than the limits for which they were insured for bodily injury liability coverage. The plaintiffs also claimed their State Farm policy's limits for uninsured and underinsured coverage.[1]
The plaintiffs alleged that at the time of the accident, Mr. Tufaro was acting in the course and scope of his employment for "The Italian Pie Franchise, L.L.C. and/or Italian Pie, L.L.C. and/or Pizza, L.L.C. and/or Musa Ulusan and/or Serdar Tilioglu and/or Tom Cangemi", or, alternatively as an agent for those entities. The petition states a claim for vicarious liability against the various corporate defendants and Messrs. Ulusan, Tilioglu and Cangemi. Mrs. Meyer claimed substantial personal injuries, damage to her car, economic and non-economic damages and medical expenses. Mr. Meyer claimed loss of consortium, service and society.
On August 31, 2001, the plaintiffs filed an amended petition adding The Perfect Crust, Inc. as a defendant. The record shows service on all named defendants.
The Italian Pie Franchise, L.L.C., Italian Pie, L.L.C., Pizza, L.L.C. and Messrs Ulusan, Tilioglu and Cangemi answered, claiming that Mr. Tufaro was employed by The Perfect Crust, Inc. at the time of the accident, and that The Perfect Crust is a franchisee of Italian Pie, L.L.C. and a separate legal entity.
Mr. Tufaro and Progressive Security Insurance Company filed a general denial and defense of failure to state a cause of action and submitting that any policy of insurance that may have been issued by Progressive to Mr. Tufaro is the best evidence of its terms and conditions. The answer also set forth alternative claims of comparative negligence, failure to mitigate damages and of unavoidable accident caused by the fault of a third party for whom the defendants are not liable.
State Farm Mutual Automobile Insurance Company answered with a general *864 denial, calling for strict proof and pleading the terms and conditions of their policy. State Farm also pled in the alternative the plaintiff's contributory and comparative negligence, victim fault, assumption of the risk, and third party fault and sought a credit for payments made by State Farm or by any other entity or carrier. State Farm also claimed it had acted reasonably and in good faith with the handling of the plaintiffs' claim and specifically averred that the plaintiffs failed to provide satisfactory proof of loss. State Farm requested a jury trial of all issues.
The Perfect Crust, Inc. filed a general denial as to both the original and amended petitions.
On April 25, 2003, the trial court granted partial summary judgment finding that Mr. Tufaro was solely responsible for the accident. The trial court designated the judgment final and appealable pursuant to La.C.Civ.Pro. art. 1915 and certified that there was no just reason to delay its appeal. There is no indication in the record that this judgment was appealed, nor was there an application to this Court for supervisory review in connection therewith.
On August 13, 2003, the plaintiffs filed a second supplemental and amending petition, naming as individual defendants Messrs Cangemi and Tiliogu and adding Mustafa Misirci. Mr. Ulusan is not named as a defendant and there is no reference to the unidentified insurer named in the original petition. Mrs. Meyer is named as a plaintiff in her additional capacity as Executrix of the Estate of her late husband. The amending petition states a new claim that the plaintiff is the third party beneficiary of an undertaking by Messrs. Cangemi, Tilioglu and Misirci to be liable for the obligations of Perfect Crust, Inc. The amending petition removes all references to Italian Pie Franchise, L.L.C., Pizza, L.L.C. and Mr. Ulusan, and alleges all references to "Italian Pie, individual and/or entity defendants" in the earlier petitions against Mr. Misirci. The plaintiff requested trial by jury[2]. Mr. Misirci filed a general denial, adopting all affirmative defenses raised by the other defendants. Italian Pie, L.L.C., and Messrs. Tilioglu and Cangemi filed a general denial to the second amending petition. Mr. Tufaro and Progressive filed a general denial revering their previous affirmative defenses and answers. The Perfect Crust, Inc. filed a general denial, reaffirming all previous affirmative defenses and answers.
On August 13, 2003, the trial court granted the plaintiff's motion voluntarily dismissing all claims against Italian Pie Franchise, L.L.C., Pizza, L.L.C. and Mosa Ulusan, without prejudice, reserving the plaintiff's rights against all other parties.
On September 12, 2003, the plaintiff filed a third supplemental and amending petition alleging that in light of the relationships between the Italian Pie, L.L.C. and Perfect Crust, Inc., the entities constituted a single business enterprise because their directors and officers did not act independently in the best interest of the companies. Furthermore, the corporations had common officers or directors and suffered from inadequate capitalization, thereby creating a "thin corporation." The plaintiffs also allege excessive fragmentation of a single enterprise into separate corporations, thereby allowing the plaintiffs to pursue Italian Pie, L.L.C. and Perfect Crust, Inc. under the "single business enterprise" theory. Perfect Crust, L.L.C., Italian Pie, L.L.C. and Messrs. *865 Cangemi, Tilioglu and Misirci filed general denials.
By judgment dated October 24, 2003, the trial court granted the plaintiff's motion for partial summary judgment that The Perfect Crust, Inc. is vicariously liable for the negligence of Mr. Tufaro, its employee. That judgment was not appealed, nor is there an indication in the record that any party sought supervisory review in this Court.
On February 18, 2004, Italian Pie, L.L.C. moved for summary judgment dismissing with prejudice the claims against this defendant. On the same day, Messrs. Cangemi, Tilioglu and Misirci filed a motion for summary judgment dismissing with prejudice the claims against them. The plaintiff filed a cross-motion for summary judgment as to the personal liability of the individual defendants.
On April 20, 2004, the trial court rendered judgment granting Italian Pie, L.L.C.'s motion for summary judgment dismissing that defendant with prejudice. The judgment denied the cross-motions for summary judgment relating to the personal liability of the individual defendants. This Court granted the plaintiff's application for supervisory writ as to the dismissal of Italian Pie, L.L.C., finding genuine issues of material fact as to whether Italian Pie, L.L.C. and Perfect Crust, Inc. operated as a single business enterprise. Meyer v. Tufaro, 2004-C-0800 (La.App. 4 Cir. 11/8/04), unpub. By order dated January 13, 2005, the trial court granted the plaintiff's motion to dismiss without prejudice her claims against Italian Pie, L.L.C., reserving the plaintiff's rights against the remaining defendants.
The individual defendants moved in limine to prohibit the plaintiff from introducing evidence relating to a claim as a third party beneficiary of a January 19, 2001 Agreement to Purchase and Sell and a February 1, 2001 Sale and Transfer of the common capital stock of The Perfect Crust, Inc. After jury selection and adjournment, the trial court heard argument and denied the motion. Counsel for the individual defendants moved to continue the trial, contending that the plaintiff's argument for personal liability of the individual defendants based on a characterization of the contract as a stipulation pour autrui constituted an enlargement of the pleadings, as to which he had a right to take discovery. The trial court denied that motion as well.
A twelve person jury tried the case over three days, and awarded damages to the plaintiff individually for physical pain and suffering in the amount of $200,000; for loss of enjoyment of life in the amount of $50,000; for past medical expenses in the amount of $111,756.87[3] and for future medical expenses in the amount of $37,500. The jury made no award for mental anguish or for the late Mr. Meyer's claim for loss of consortium. Based on these findings, the trial court rendered judgment on January 26, 2005 in favor of Mrs. Meyer and against Mr. Tufaro, Progressive, The Italian Pie Franchise, L.L.C., Italian Pie, L.L.C., Pizza, L.L.C. and Perfect Crust, Inc. in the amount of $399,256.87 with costs and interest from the date of judicial demand. The trial court rendered judgment in favor of the individual defendants as to all claims, and in favor of all defendants as to the claims of Mr. Meyer's estate. The judgment was signed on March 28, 2005.
The plaintiff filed a petition for devolutive appeal on May 3, 2005. According to the appellant's brief, a Motion for New *866 Trial was filed on April 4, 2005 to correct the judgment to reflect accurately the jury verdict. The trial court granted the Motion for New Trial and issued an amended judgment on April 19, 2005, casting in judgment only Mr. Tufaro, Progressive and Perfect Crust, Inc.
Mrs. Meyer, individually and on behalf of her late husband's estate[4], filed a petition for appeal on May 3, 2005. Mr. Tufaro and Progressive filed a Motion for Suspensive Appeal on May 25, 2005.
Mr. Tufaro and Progressive claim that the trial court erred by not limiting the judgment against Progressive to its policy limits. The parties stipulated at oral argument that the judgment against Progressive should be so limited.
Mr. Tufaro and Progressive also claim that the trial court erred in having failed to reduce the jury's allegedly excessive award.
In reviewing the factual findings of a trial court, an appellate court is limited to a determination of manifest error. Hill v. Morehouse Parish Police Jury, 95-1100 (La.1/16/96), p. 4, 666 So.2d 612, 614. Ferrell v. Fireman's Fund Ins. Co., 94-1252 (La.2/20/95), 650 So.2d 742, 745; Stobart v. State Through Dept. of Transp. and Development, 617 So.2d 880 (La.1993); Arceneaux v. Domingue, 365 So.2d 1330 (La. 1978). We are instructed that before a fact-finder's verdict may be reversed, we must find from the record that a reasonable factual basis does not exist for the verdict, and that the record establishes the verdict is manifestly wrong. Lewis v. State Through Dept. of Transp. and Development, 94-2370 (La.4/21/95), 654 So.2d 311, 314. Although we accord deference to the fact finder, we are cognizant of our constitutional duty to review facts[5], not merely to decide if we, as a reviewing court, would have found the facts differently, but to determine whether the trial court's verdict was manifestly erroneous, clearly wrong based on the evidence, or clearly without evidentiary support. Ambrose v. New Orleans Police Department Ambulance Service, 93-3099 (La.7/5/94), 639 So.2d 216, 221; Ferrell v. Fireman's Fund Ins. Co., 94-1252 (La.2/20/95), 650 So.2d 742, 745.
Our initial inquiry is whether the award for the particular injuries and their effects under the particular circumstances on the particular injured person is a clear abuse of the "much discretion" of the trier of fact. Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963); Ballard v. National Indem. Co. of Omaha, Neb., 246 La. 963, 169 So.2d 64 (1964); Lomenick v. Schoeffler, 250 La. 959, 200 So.2d 127 (1967). Only after such a determination of an abuse of discretion is a resort to prior awards appropriate and then for the purpose of determining the highest or lowest point which is reasonably within that discretion. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976); Bitoun v. Landry, 302 So.2d 278 (La.1974); Spillers v. Montgomery Ward & Co. Inc., 294 So.2d 803 (La.1974); Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993) cert. den. 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994).
The standard for appellate review of general damage awards is difficult to express and is necessarily non-specific, and the requirement of an articulated basis for disturbing such awards gives little guidance as to what articulation suffices to justify modification of a generous or stingy *867 award. Nevertheless, the theme that emerges from the jurisprudence is that the discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. It is only when the award is, in either direction beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award. Youn v. Maritime Overseas Corp., supra. The standard of review for damage awards requires a showing that the trier of fact abused the great discretion accorded in awarding damages. In effect, the award must be so high or so low in proportion to the injury that it "shocks the conscience." Moore v. Healthcare Elmwood, Inc., 582 So.2d 871 (La.App. 5th Cir.1991).
The jury's awards to Mrs. Meyer are not obviously the result of passion or prejudice, and they bear a reasonable relationship to the elements of the proved damages. Perhaps a rational trier of fact could have decided that a lower award is more appropriate, but we cannot conclude from the entirety of the evidence, viewed in the light most favorable to the prevailing party in the trial court, that a rational trier of fact could not have fixed the awards of general damages at the level set by the trial judge or that this is one of those "exceptional cases where such awards are so gross as to be contrary to right reason." See, Bartholomew v. CNG Producing Co., 832 F.2d 326 (5th Cir. 1987); Youn, supra.
Our review of the record in its entirety convinces us that the jury's findings as to Mrs. Meyer's damages are reasonable in light of that record. We are mindful of the standard of review of the verdict of a properly instructed jury.
"Where there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. . . .[A]ppellate courts must constantly have in mind that their initial review function is not to decide factual issues de novo. . . . When findings are based on determinations regarding the credibility of witnesses, the manifest errorclearly wrong standard demands great deference to the trier of fact's findings; for only the fact finder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. . . . [Where] a fact finder's finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong." Rosell v. ESCO, 549 So.2d 840, 844-845 (La.1989).
Dr. John Finney, M.D. was accepted by the trial court without objection as an expert in family practice. Dr. Finney was Mrs. Meyer's family physician, and first saw her in June of 1989. He testified that prior to the accident he had treated Mrs. Meyer with anti-inflammatory agents, muscle relaxers and, when necessary, pain medication for her neck and back complaints. The doctor testified to having treated Mrs. Meyer for neck pain in June, 1995 resulting from an automobile accident. He treated her with an anti-inflammatory and a muscle relaxer. The doctor had not recorded any further neck complaints until the accident in question in the instant litigation. Two days after the accident, she saw the doctor, complaining of neck pain, whereupon his physical examination showed a decreased range of motion in the neck, tightness, tenderness and spasm in her neck muscles. He diagnosed her with neck muscle strain and gave her an anti-inflammatory and a muscle relaxer. He continued to treat her. Ultimately, *868 Mrs. Meyer had an MRI scan of her neck and back showing three bulging discs and some bone spurs in her neck. The bone spurring, according to the doctor, happens over a long period of time and is caused by bones rubbing together. The bone spurs indicated long-term changes in Mrs. Meyers' neck. These degenerating areas are evidence of a weakened condition causing her to be more prone to injury, even from minor impact. Dr. Finney testified that even a sneeze or cough could herniate or rupture a disc, and the more degenerative changes a person has, the more susceptible she would be to this type of injury.
Dr. Finney saw Mrs. Meyer for her back problems in 1995 in connection with the previously discussed automobile accident. The doctor treated her with an anti-inflammatory and muscle relaxer. At that time, she did not need back surgery. He treated her in August of 1998 for back pain associated with Mrs. Meyers' having picked up a box at work. She complained of low back pain that worsened when she sat down. He diagnosed her with a lumbar strain and muscle spasm, and prescribed anti-inflammatories, muscle relaxers and pain pills. He did not consider surgery at that time. Dr. Finney saw Mrs. Meyer for unrelated issues in 1995, 1996, 1997 and 1998. He prescribed Vicodin and Vicodin Extra Strength for Mrs. Meyer five times in 1998 Dr. Wiedemann of a local orthopedic clinic prescribed Percocet during the same period. Dr. Finney prescribed narcotic painkillers for Mrs. Meyer five times in 2000 prior to the accident in question.
Two days before the accident he saw Mrs. Meyer, who was then complaining of some back pain, fatigue and sinus allergy symptoms. She also complained of right lower back pain for which she had seen Dr. Bernard Manale, M. D., an orthopedist, in the past. Dr. Manale had taken negative X-rays the previous year and the doctors felt the lower back pain had been caused by a muscle strain.
According to Dr. Finney, Mrs. Meyer's neck and back pain did not go away after the accident in question. When specifically questioned as to whether a minor rear-end collision such as that in which Mrs. Meyer and Mr. Tufaro were involved could cause herniation of Mrs. Meyers' discs and the neck and back pain of which she complains, the doctor testified:
[A]ny kind of rear-end impact can cause a major problem. If you have a spine that's in a weakened condition to begin with, it doesn't take much to rupture a disc or herniate a disc. And if you're rear-ended in the car or hit broadside in a car, if there's any kind of jolting injury to the neck or the spine, it can herniate a disc, so, no, I don't think that the motor vehicle accident could be considered minor.
Dr. Finney testified that at no time prior to the accident in question did he consider Mrs. Meyer a candidate for spinal surgery. After the accident, she went through a course of conservative treatment including epidural steroid injections that did not resolve her complaints. On June 14, 2001, she underwent spinal fusion surgery. Because she continued to suffer pain after the surgery, additional epidural steroid injections were administered, and a bone scan determined that, as a complication of the surgery, she suffered from an infection of the disc area for which a second hospitalization of nearly a month and a second surgery were required.
Dr. Finney testified that the back and neck injuries sustained by Mrs. Meyer were related causally to the accident in question. He testified that the herniated discs in Mrs. Meyer's cervical spine would cause her continuing chronic, daily pain, *869 particularly during changes in the weather.
Dr. Manale was recognized as an expert orthopedic surgeon. His practice first saw Mrs. Meyer in March of 1999, when she complained of left knee and back pain. Dr. Manale's associate diagnosed bursitis of the hip, flat feet and a lumbar syndrome, and prescribed an inflammatory and special shoe inserts. He did not recommend an MRI or back surgery. Mrs. Meyer was not seen again in Dr. Manale's office until a few weeks after the accident in question, when she complained of neck and back pain and gave a history of a motor vehicle accident. Mrs. Meyer also had a previous history of back and neck pain, and had been treated by Dr. Finney. He found a worsening of Mrs. Meyer's pre-existing symptoms. He testified that Mrs. Meyer had been completely truthful about her medical history. He treated Mrs. Meyer conservatively and when it became apparent that she was not improving, he ordered an MRI in October of 2000. The MRI showed that Mrs. Meyer had disc narrowing and desiccation, and a rupture. In Dr. Manale's opinion, the disc was already degenerated, and then the accident caused it to rupture, worsening her symptoms. While the MRI of Mrs. Meyer's neck showed evidence of degeneration and bone spurs, there were no ruptures, nor was there evidence of pressure on the nerves.
Dr. Manale continued to treat Mrs. Meyer conservatively, including administration of epidural steroid injections, through the spring of 2001. When her pain continued, and after having obtained a second opinion, he obtained Mrs. Meyer's consent to surgery. On June 14, 2001 performed a discectomy and fusion. He described the surgery to the jury. He also confirmed Dr. Finney's testimony that Mrs. Meyer suffered discitis, a known complication of the fusion surgery, requiring additional surgical intervention. This resulted in Mrs. Meyer's having two wounds, the original incision from the rear and a second incision from the front. According to Dr. Manale, Mrs. Meyer still suffers back and neck pain. When he last saw Mrs. Meyer, she was completely disabled as a result of her back problems. Dr. Manale testified that it is more likely than not that Mrs. Meyer's disc ruptured as a result of the rear-end collision that is the subject of this litigation.
Based on the medical testimony and supporting documentary evidence, and applying the previously outlined standard of review, we conclude that the jury's award is not excessive.
Mr. Tufaro and Progressive also claim that the trial court erred in having granted the Motion for Directed Verdict filed on behalf of the individual defendants. The plaintiff claims that the trial court erred in having concluded that the individual defendants were not liable for the obligations of Perfect Crust, Inc. relying on the provisions of the February 1, 2001 Sale and Transfer.
Thomas Cangemi testified that he is employed by Italian Pie Franchise, L.L.C., a company that franchises approximately twenty-five Italian Pie restaurants. In May of 1999, he, along with others, were shareholders in Perfect Crust, Inc., a subchapter S corporation. Perfect Crust was created to own and operate an Italian Pie franchise restaurant on Magazine Street in New Orleans.
Mr. Cangemi identified the Articles of Incorporation filed with the office of the Louisiana Secretary of State on May 13, 1999. The Articles identified Mr. Cangemi as the incorporator and noted that all of the capital stock of the corporation would be issued in accordance with the provisions of Section 1244 of the Internal Revenue *870 Code. The Initial Corporation Report identified the corporation's location, registered agent and directors, Messrs. Cangemi and Misirci. Mr. Cangemi testified that the corporation was formed and the articles recorded so that Perfect Crust would be a separate, legal entity. He identified the minutes of the May 11, 1999 Shareholders' First Meeting electing Messrs. Cangemi and Misirci to the Board, a Waiver of Notice of Shareholders Meeting, a Waiver of Notice of Board Meeting and minutes of the board meeting at which he was elected president and Mr. Misirci was elected secretary-treasurer of the corporation. He identified the corporation's by-laws and copies of the corporation's stock certificates showing that Messrs. Misirci, Tiglioglu and Cangemi each owned 300 shares of the corporation's stock. Mr. Cangemi testified that he had originally owned 600 shares, and had sold 300 of his shares to Mr. Tiglioglu for $64,000 by an Act of Sale dated January 1, 2000.
On February 2, 2000, the shareholders entered into an agreement regulating their rights and responsibilities concerning transfer of their shares, acquisition of life insurance on the shareholders, actions upon the death of any shareholder or shareholders, issuance of additional stock, dissolution and miscellaneous matters. Mr. Cangemi identified the Franchise Agreement dated June 4, 1999 between Perfect Crust as franchisee and Italian Pie, LLC as franchisor. Mr. Cangemi also identified minutes of Perfect Crust board meetings. He testified that as a director and officer of Perfect Crust he followed all of the formalities as to respecting the corporation's existence while he was a shareholder. According to Mr. Cangemi, the shareholders never borrowed cash from Perfect Crust.
Mr. Cangemi testified that the shareholders' investment in the corporation was between $240,000 and $250,000. In January of 2001, Mr. Chang, who operated the Rampart Street Italian Pie franchise, was eagerly pursuing the shareholders for a new location. The Magazine Street franchise was up and running, and the shareholders felt that they had over-invested in the location. They believed that Mr. Chang could operate the restaurant while they could then develop other franchises outside Louisiana.
On January 19, 2001, the shareholders and Mr. Chang entered into an Agreement to Purchase and Sell, identified at trial by Mr. Cangemi. James Derbes represented Mr. Chang in the transaction and drafted the document, although the shareholders assumed that Mr. Derbes would look out for both their interests and Mr. Chang's interest. Mr. Cangemi understood that he was selling his stock in the corporation, and understood that he, as a shareholder, would not be liable personally for any of the corporation's debts. In fact, the corporation had been formed in order to avoid personal liability. The transaction was structured as a stock sale rather than a sale of assets. When the instant lawsuit was filed, the former shareholders went to Mr. Chang and offered to pay him an additional $63,000 to amend the purchase and sale to eliminate any question that the shareholders were to be held individually liable for damages arising out of the Tufaro accident.
Mr. Cangemi testified that at the time he entered into the January 19, 2001 Agreement to Purchase and Sell and the February 1, 2001 Sale and Transfer of stock, it absolutely was not his intention to confer a benefit upon Mrs. Meyer. He testified further that prior to the original confection of the Agreement to Purchase and Sell, there were no detailed, formal negotiations between the shareholders and *871 Mr. Chang, but that the parties just agreed on the price.
On February 1, 2001, Mr. Cangemi and the other Perfect Crust shareholders sold Perfect Crust to James Chang for $140,000, taking a loss on their investment of at least $100,000. In connection with Mr. Cangemi's testimony, the plaintiff introduced the Act of Sale and Transfer, that provided in pertinent part:
4. SELLER is and shall remain responsible for any and all litigation that has arisen or may arise in connection with Seller's operation of the Restaurant through this closing and SELLER hereby agrees to pay all costs, fees and expenses incurred in connection with the said defense and/or prosecution of such litigation, including, without limitation, all damages, judgments and legal fees.
* * *
10. SELLER agrees to hold PURCHASER harmless and to indemnify PURCHASER from any and all consequences of the failure of SELLER to abide by any of the obligations undertaken by it herein.
This contract bears the signatures of Thomas W. Cangemi, his wife, Dianne Heins Cangemi, Serdar Tiglioglu, Mustafa Misirci and his wife, Yordana Chirinos Misirci. At the time this contract was signed, the accident in question had taken place, but suit had not been filed on behalf of the plaintiff and her husband.
Mr. Cangemi testified that when he signed the contract he understood that he would be responsible for acts that he caused, such as non-payment of taxes or if he had sexually harassed someone. When he signed the contract, he knew only of a fender-bender accident reported eight months previously. In August of 2001 he received a lawsuit alleging serious injuries, more significant than a "fender-bender." His attorney advised him to enter into an Amendment to the Agreement to Purchase and Sell that would amend the contract specifically to have Perfect Crust remain solely responsible for the accident in question. That amendment was entered into on March 19, 2002.
Mr. Cangemi testified that around November of 2001 Mr. Chang sold the assets of Perfect Crust. According to Mr. Cangemi, he and the other shareholders had sold Mr. Chang the restaurant at a very reasonable price, and forgave him approximately $60,000 in debt. Mr. Chang was one of the company's franchisees, had also operated another restaurant and was having financial problems.
Mr. Tiglioglu testified that he acquired 300 shares of Perfect Crust common stock on January 1, 2000 for $64,000. The shareholders invested an additional $250,000 to $260,000 to complete the restaurant's construction and open it for operation. He handled the corporation's finances. Perfect Crust had its own bank account and its own federal tax identification number. It had its own liquor license for the Magazine Street location and held an occupational license for the Magazine Street restaurant. The licenses are posted for public view and updated annually. Perfect Crust files its own sales tax, income tax and payroll tax returns. Prior to the sale of stock to Mr. Chang, the shareholders had no personal liability for Perfect Crust's debts. Because of his investment in the business, his sale of his 300 shares of stock to Mr. Change resulted in a personal loss of approximately $30,000. At no time did he understand that he would be responsible for Perfect Crust's debts. Furthermore, at the time of signing the Agreement to Purchase and Sell or the Sale he had no intention of conferring a benefit on a third party such as Mrs. Meyer.
*872 Mr. Tiglioglu testified that the shareholders did not manage the restaurant, and that Mr. Tufaro was the employee of Perfect Crust and was paid by Perfect Crust. The shareholders did not own the restaurant's assets; the assets were owned by Perfect Crust.
After he learned about the reimbursement clause contained in the Agreement to Purchase and Sell, he went back to Mr. Chang to amend the document, eliminating the reimbursement and agreeing with Mr. Chang that he would not owe any additional money on the purchase price. This forgiveness of debt was done also to accommodate Mr. Chang because the restaurant was then losing money.
Mr. Tiglioglu identified the petition and amending petition, and testified that the first allegation that he owed Mrs. Meyer any money because of his sale of the business was contained in the amended petition filed on August 13, 2003.
Mrs. Meyers testified concerning the various petitions filed on her behalf in these proceedings, and her counsel stipulated that he and Mrs. Meyer first obtained a copy of the Sale documents in March of 2003. Mrs. Meyer testified that she did not believe that she acquired copies of the documents from any other source other than through her counsel. Mrs. Meyer also admitted that she, herself had formed a corporation, Advanced Timekeeping and Payroll, Inc., and chose the corporate form in order to avoid personal responsibility for the corporations debts. She understood that if she followed the corporate formalities and respected the existence of the corporation, she would not be responsible personally for its debts.
Mrs. Meyer contends that the former shareholders are individually liable to her pursuant to the provisions of the Agreement to Purchase and Sell, particularly paragraph 4.1. In that document, the then shareholders agreed to remain responsible for litigation and claims made against the "Seller", as that term is defined in the agreement. In the introductory paragraph to the Agreement to Purchase and Sell, "Seller" is defined as Messrs. Cangemi, Tiglioglu and Misirci. Perfect Crust is NOT named as the Seller. Therefore, the provision in paragraph 4.1 does not apply to the debts of Perfect Crust, but to any liabilities that the individuals (known as "Seller" in the document) might have incurred through and including the effective date, defined in the agreement as the time of closing. In this case, the closing took place on February 1, 2001, so that date is the effective date for purposes of the agreement. This reading is perfectly consistent both with the language of the document and with the testimonial understanding expressed at trial by both Mr. Cangemi and Mr. Tiglioglu. Both gentlemen understood that they would reimburse the purchaser for any damages or litigation expenses resulting from their own personal acts, such as failure to pay corporate taxes or individual wrongdoing. Since none of the individual shareholders were involved in the management of the restaurant or employment of Mr. Tufaro, their undertaking is irrelevant to the accident that is the subject of this litigation.
Apparently in response to concerns brought about by the filing of the original lawsuit, the parties amended the Agreement to Purchase and Sell on March 19, 2002, to make clear that the former shareholders were not to be held personally liable for the acts of Perfect Crust's employee, Mr. Tufaro. However, in light of the foregoing clear reading of the original agreement, the amendment merely recognizes the fact that the original agreement did not contain such an undertaking.
*873 As further confirmation of the parties' intention, the Act of Sale and Transfer of the shareholders' shares to Mr. Chang recites that the shareholders remain responsible for litigation arising in connection with the shareholders' (not Perfect Crust's) operation of the Restaurant. Thus, once again, if the individual shareholders were negligent or otherwise deficient with respect to payment of Perfect Crust's taxes and license fees, those shareholders would be responsible to Mr. Chang for those payments.
The plaintiff also claims that the trial court erred in having concluded that the plaintiff was not a third party beneficiary to the February 1, 2001 Sale and Transfer, precluding the individual defendants from amending the contract to eliminate their liability without the plaintiff's consent.
Louisiana's Civil Code provides that a contracting party may stipulate a benefit for a third person not a party to the contract. La.C.C. art. 1978. Under Louisiana law, such a contract for the benefit of a third-party is referred to as a stipulation pour autrui and gives the third party beneficiary the right to demand performance from the promisor. Whitney Natl. Bank v. Howard Weil Financial Corp., 93-1568 (La.App. 4 cir. 1/27/94), 631 So.2d 1308. A stipulation pour autrui is never presumed. Rather, the intent of the contracting parties to stipulate a benefit in favor of a third party must be made manifestly clear. Smith v. State Farm Ins. Companies, XXXX-XXXX, pp. 4-5 (La.App. 4 Cir. 3/3/04), 869 So.2d 909, 912-13. To establish a stipulation pour autrui, the third party relationship must form the consideration for a condition of the contract, and the benefit may not be merely incidental to the contract. Concept Design, Inc. v. J.J. Krebs & Sons, Inc., 96-1295, p. 5 (La.App. 4 Cir. 3/19/97), 692 So.2d 1203, 1205-06. The party demanding performance of an obligation pursuant to a stipulation pour autrui bears the burden of proving the existence of this obligation. See, La.C.C. art. 1831.
Both Mr. Cangemi and Mr. Tiglioglu testified emphatically that they had no intention of conferring any benefit upon Mrs. Meyer when they signed the various documents pertaining to the purchase and sale of their stock. Furthermore, in light of the foregoing analysis of the specific undertaking included in the Agreement to Purchase and Sell shares and the Sale and Transfer of the shares, it is clear that the individual shareholders did not create either a primary obligation with respect to this accident in favor of Mr. Chang or a third party beneficiary contract or stipulation pour autrui in favor of Mrs. Meyer. The Tufaro accident was not a claim or litigation arising from those portions of the corporation's operations conducted by the "Seller", i.e., the individual shareholders. The accident was related to Perfect Crust's operations through its manager, who hired and supervised Mr. Tufaro, and Mr. Tufaro himself as the corporation's employee. Therefore, the accident is outside the ambit of the undertaking contained in the Agreement to Purchase and Sell shares and in the Sale and Transfer of shares.
For the foregoing reasons, we amend the judgment of the trial court insofar as it awards damages against Progressive Security Insurance Company in excess of its policy limits. We affirm the jury's finding of total damages in the amount of $399,256.87 and the jury's assessment of damages against Mr. Tufaro and Perfect Crust, Inc.
AMENDED IN PART AND, AS AMENDED, AFFIRMED.
BELSOME, J., dissents in part.
*874 BELSOME, J., dissents in part.
I agree with the majority that the corporate form insulates officers and stockholders from personal liability. However, when those same officers agree in a contract to remain personally liable for the corporation's debts after the corporation is sold, then those officers have abandoned that insulation.
The language of the Agreement to Purchase and Sell is clear. "SELLER is and shall remain responsible for any and all litigation that has arisen or may arise in connection with Seller's operation of the Restaurant . . ." Seller is then defined as "Thomas W. Congemi (sic) . . . Mustafa Misirci . . . and Serdar Tilioglu . . ." A restaurant employee rear-ended Mrs. Meyer during the course and scope of his employment with the Individual Defendants' restaurant. The damage caused to Mrs. Meyer arose in connection with their operation of the Restaurant. The Act of Sale and Transfer, which adopted the language of the Agreement to Purchase and Sell, was never amended, thus the Individual Defendants maintained liability under the February 1, 2001 Sale and Transfer contract.
There was a valid stipulation pour autrui that could not be amended. A contracting party may stipulate a benefit for a third person called a third party beneficiary. Once the third party has manifested his intention to avail himself of the benefit, the parties may not dissolve the contract by mutual consent without the beneficiary's agreement. LSA-C.C. art. 1978. Mrs. Meyer evidenced her intention to avail herself of the benefit when she filed suit.
We find this case analogous to Dartez v. Dixon, 502 So.2d 1063 (La.1987):
Plaintiff, Sylvester Dartez, was a passenger in a car that was struck from behind by an 18-wheel truck on September 15, 1975. On September 15, 1976, plaintiff filed suit against the driver of the truck, Sammie Sossaman, and the owner of the truck, Adam Dixon. On October 1, 1980, Dartez filed a supplemental and amending petition to add two more defendants, Big Chief Truck Lines, Inc. (Big Chief-Louisiana) and Early American Insurance Company. At the time of the accident, Big Chief-Louisiana was leasing the truck from Dixon and was the employer of Sossaman; Early American was the insurer of Big Chief-Louisiana.
At the time of the accident, all the stock of Big Chief-Louisiana was owned by Big Chief Truck Lines of Texas, Inc. (Big Chief-Texas) whose sole shareholder was Dr. Stewart Bushong. However, after the collision but before Big Chief-Texas was made a party in this suit, Big Chief-Texas entered into a stock sales agreement to transfer all the stock of Big Chief-Louisiana to Joseph LeJeune, Jr. and Andrew Vidrine. Section III(b) of the agreement stated:
"(b) Shareholder [Big Chief-Texas] hereby agrees that as of the closing date it will be responsible for the payment of all liabilities incurred by the Company [Big Chief-Louisiana] on or prior to the date hereof occasioned by any act whatsoever of Shareholder, or by the Company, its officers, agents, employees and representatives, occurring on or prior to the date hereof.
Dartez v. Dixon, 502 So.2d 1063, 1064 (La. 1987). The Supreme Court held that the liability and indemnity clause in the stock sales agreement was a calculated and essential part of the negotiations leading to the sale of the stock, and it had created a stipulation pour autrui in favor of the plaintiff.
The situation in Dartez is analogous to the case at hand. The Individual Defendants were aware of the accident at the *875 time of the sale, agreed to remain personally liable for any events that occurred in connection with their management, and the plaintiff sued the Individual Defendants. Mrs. Meyer, like the plaintiff in Dartez, was a beneficiary of the contract.
The Individual Defendants argue that they were unaware that Mrs. Meyer was intending to sue when they signed the agreement to remain personally liable, therefore there was no intended beneficiary of the contract, which negates the stipulation pour autrui claim. I agree with the Third Circuit, which held that a stipulation pour autrui may be made in favor of undetermined persons. Hazelwood Farm, Inc. v. Liberty Oil and Gas Corp., XXXX-XXXX (La.App. 3rd Cir.6/20/01); 790 So.2d 93.
For the reasons listed above, the Individual Defendants are bound by the language in both contracts whereby they agreed to remain personally liable for any company debts that might arise in connection with their management of the restaurant, and there was a also valid stipulation pour autrui in favor of Mrs. Meyer which invalidates the amendment to the Agreement to Purchase and Sell. I respectfully dissent.
NOTES
[1] On December 12, 2002, the plaintiffs dismissed with prejudice their claims against State Farm, reserving their rights against the remaining defendants.
[2] This amending petition reasserts the allegations against State Farm. By order dated September 23, 2003, the trial court granted the plaintiff's motion to dismiss State Farm with prejudice.
[3] The parties stipulated to the amount of recoverable medical expenses, but did not stipulate that these expenses were necessitated by the accident in question.
[4] The appellate brief assigns no error with respect to the jury's failure to award damages to the estate for loss of consortium.
[5] See, LSA-Const. Art. 5, section 10(B).